## Hazelwood v. McKenna.

(Decided December 17, 1920.)

### Appeal from Fayette Circuit Court.

1. Appeal and Error—Verdict.—A verdict of a jury will not be disturbed by this court unless it be palpably against the weight of the evidence.

2. Appeal and Error—Evidence.—Where there is clear and satisfactory evidence in support of the verdict it will not be disturbed by this court even though this court would have made a different finding on the facts.

W. P. KIMBALL for appellant.

H. E. ROSS and MILLER & MILLER for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

It is admitted by the parties to this appeal that appellant Hazelwood sold and agreed to deliver to appellee, McKenna, a bunch of hogs averaging 200 pounds each, at the price of $10.00 per one hundred pounds. This contract was made in December, 1916, and the delivery of the hogs was to take place on the first of March, 1917, at which time the price was to be paid by McKenna to Hazelwood. The hogs were not delivered and McKenna brought this action against Hazelwood to recover damages for breach of contract in the sum of $850.00. A trial resulted in a verdict for the full amount prayed and Hazelwood appeals.

No question is made with reference to the instructions of the court; nor does counsel for appellee point out any error in the introduction of evidence, but a reversal of the judgment is sought solely upon the ground that the verdict is not sustained by sufficient evidence. In brief of counsel for appellee it is stated that the jury "seems to have taken the bull by the horn, so to speak, and decided it (the case) in favor of appellee (plaintiff)." We therefore need only briefly review the evidence to determine whether the verdict is sustained by sufficient evidence.

First. We may say the petition of appellee, McKenna, sets forth the contract in the following way: "In the fall of 1916, defendant, Perry Hazelwood, sold to plaintiff one hundred hogs on foot at $10.00 per 100 pounds, and promised and agreed with plaintiff to de-

liver him said hogs on foot, upon demand, in the month of March, 1917; and further promised and agreed that the said hogs would average 200 pounds each, in consideration of which plaintiff promised and agreed to pay defendant upon delivery of said hogs $10.00 per 100 pounds for each 100 pounds of said hogs on foot delivered to him; that on the — day of March, 1917, the plaintiff demanded that the defendant deliver the said hogs sold to him by defendant as aforesaid, and that the defendant failed and refused and has continuously since said demand failed and refused to deliver to plaintiff said hogs or any part thereof; that plaintiff was at the time of said demand and has been at all times since said time and is now ready, willing and able to accept and pay for said hogs as aforesaid; that by reason of the breach of contract on the part of the defendant as aforesaid plaintiff has been damaged in the sum of eight hundred and fifty ($850.00) dollars, no part of which has been paid.''

The first paragraph of the answer of Hazelwood traverses the allegations of the petition. The second paragraph of the answer admits that in December, 1916, he (Hazelwood) agreed to furnish plaintiff with eighty hogs to average 200 pounds each, to be delivered to said plaintiff at the scales near the farm of defendant; that said hogs should be weighed and delivered to plaintiff at said point on the first day of March, 1917, at six o'clock a. m.; that the plaintiff failed to appear and receive and pay for said hogs at said time as he agreed to, and on or about the 5th day of March, when the plaintiff called or talked over the 'phone and inquired about said hogs, he did not make any demand for the delivery of same to him at that time or at any other time. The answer further avers that the time of delivery was of the essence of the contract, and that the defendant informed the plaintiff that he needed the money on the 1st day of March in order to meet certain obligations for rent which he was to pay on that date; that the plaintiff violated and repudiated his agreement with defendant by failing to appear at the time and place of delivery to receive and pay for the hogs.

Excluding the plaintiff and defendant, there were just two other witnesses, one who testified for the plaintiff, and the other who testified for the defendant. The evidence is very brief. Aside from that given by plaintiff and defendant the evidence is largely collateral.

The plaintiff, McKenna, after testifying that he lived in Lexington, and was and had been for some years engaged in buying and selling pigs and hogs as the agent of Price & Company, as well as upon his own account, stated that he was acquainted with the defendant Hazelwood and had been for eight or ten years before the trial and that he had traded with Hazelwood, buying from him eight or ten different bunches of hogs; that in December, 1916, he had a conversation with Hazelwood about one o'clock on Saturday, in one of the bank buildings in Lexington, at which no third person was present. The plaintiff was then asked:

"Q. State the conversation you had with Hazelwood with reference to the hogs? A. Mr. Hazelwood asked me what hogs would be worth in March and says I have a hundred and I can make them weigh two hundred by the first of March, and asked me what I would give for them, and I said, I don't know what they will be worth, but, I said, what will you take. And then at that time I was paying eight and one-quarter cents for hogs, and I said, I will take a chance on it and give you ten cents; he asked me ten for them and I said I would take a chance on them. . . Q. Then, as I understand you, the price had to go up one and three-fourths cents before you could even break even with your contract? A. Yes, sir; and I bought the hogs as of the first of March, to weigh two hundred pounds and was to be one hundred hogs, and I said, do you want a contract or I will put up the money or either furnish you a bond to take the hogs, they may go up or down, and he said, your word is all right, and I said, I will take them and it will be all right, and I said, I know they may go up or down; and on two occasions I met him before the first of March and asked him how the hogs are doing and one day on Cheapside I asked him how they were and he said, 'Hell, they are all dying with the cholera,' and I said mine is not dying, and he wouldn't even talk to me about the hogs. . . . Q. Had hogs gone up at that time? A. Yes, sir; one dollar a hundred then, and before the first day of March I tried to call Perry up and couldn't and on the first day of March between half past five and six o'clock I called up Perry's house and got either his wife or daughter, I couldn't say which, and told them to tell him to come to the 'phone and said, I am ready to receive those hogs this morning. . . . Q. That was in the morning between five and six o'clock on March 1st? A. Yes, sir;

and I had to have those hogs that day or some other hogs. Q. Why did you have to have those hogs that day? A. Because I had to furnish those hogs under contract with Mr. Price, that day, and so I called up Mr. Hazelwood and talked to him, and says to him, Perry, I am ready to receive those hogs this morning, and he said, Hell you hain't going to get any hogs from me, and I said, why, and he said, half of those hogs died with the cholera, and said I told you that a month ago, and I said, you know I would have got those hogs if hogs had gone down, I said you know I would have got them, and you know you would make me take them, and I said, you let me know whether you are going to let me have them, I says, I am going to do the same thing to you, and he said, I am not going to let you have them. Q. Did he give you any reason for not letting you have them? A. No, sir; no reason. Q. On that day what did you pay for hogs? A. I bought them in Cincinnati and paid $13.00 and shipped them here. Q. What was the market price on that day of hogs? A. I would have paid $13.50 on that day. Q. Was anything said at the time the contract was made between you and Mr. Hazelwood as to where the hogs were to be deliverd. A. There never has been any question like that arise between me and him in weighing hogs or in buying hogs from him. Q. Had there been any definite place set in this contract where the delivery of the hogs should be? A. None on earth. Q. You said you dealt with Mr. Hazelwood many times before with reference to buying and selling hogs? A. Yes, sir. Q. What was the custom between you two as to the delivery of hogs, whether or not there was any definite place for delivery? A. I bought hogs from Hazelwood and sent them to Weisenbach, sent them there and settled from his weight, and I bought hogs from Hazelwood and sent them to Price the same way. Q. Was anything said during that conversation with Mr. Hazelwood at the time the contract was entered into or any other time that the hogs should be delivered at promptly six o'clock of March 1st at Mr. Persley's scales? A. No, sir; that question never arose; it is the buyer's place to be there if he wants to protect himself and see the hogs weighed whether at 5 or 3 or 1 o'clock or 6 o'clock in the morning; if I am to get there at 9 o'clock to weigh the hogs it is up to me to be there and attend to my own business. Q. Was Mr. Persley's scales ever mentioned to you? A. No, sir. Q. Did you have any other information

from Mr. Hazelwood as to the delivery of these hogs other than the definite message when he told you he would deliver them? A. No, sir. Q. Did you have any conversation over the 'phone about where the hogs were to be delivered? A. No, sir. Q. Did you ask him on that occasion whether or not he would deliver them? A. He said he would not let me have them; there was no question raised about where he would deliver them after he weighed them, if he weighed them at. Persley's scales I would have been too glad to go after them. Q. On the morning of March 1st, did you go out and buy hogs? A. I did. Q. Where did you buy them? A. Louisville. Q. What did you pay for them? A. $13.50 there. Q. What was the market price here? A. $13.50 here at home. I would have paid for them that day right here at home.''

In addition to the foregoing evidence McKenna further testified that hogs of the type he purchased were select heavies which at the Cincinnati market on the 1st of March, the time of delivery, were worth $13.65, and the Chicago market was $13.50 per 100 pounds for such hogs; and that the price of hogs had commenced to go up long before the 1st of March. He was sustained in his evidence by S. S. Price, of Price & Company, who conducted a slaughterhouse in Lexington.

On the other side appellant Hazelwood testified that he sold the hogs to McKenna in December for delivery on the 1st of March, saying, ''I sold Mr. McKenna 80 hogs to weigh 200 pounds each to go at ten cents the first morning of March . . . 80. That is all I had. I sold him 80 to weigh 200 pounds at ten cents and taken on the first morning of March, and the first morning of March he never did come to get the hogs and never called up until the 4th of March at 9:30 o'clock.'' The defendant was sustained in part by his son, James Hazelwood, with reference to the conversation had at the bank with the plaintiff, but his evidence was very slight.

With the evidence of these four persons before the jury it determined that Hazelwood had sold and agreed to deliver at least 80 hogs, weighing 200 pounds each, to McKenna at the price of $10.00, the delivery to be made on March 1st, and that the price of hogs of that character had advanced from $10.00 in December to $13.50 on March 1st; that Hazelwood refused to deliver the hogs but sold them at a higher price to other buyers; that the difference between the contract price, $10.00

per 100 pounds on the hogs contracted to be delivered on the first of March, and the market price at that date, was at least $850.00, the amount sued for. With this finding of fact we can find no fault because the evidence fully sustains it. The weight of the evidence is with the verdict, not against it, and as this is the only ground upon which we are asked to reverse the judgment a reversal must be denied and the judgment affirmed.

Judgment affirmed.